GEORGE A. JACOBSON,                                    CIV. NO. 12-984 (PJS/JSM)

      Plaintiff,                                    REPORT AND RECOMMENDATION

v.

MICHAEL J. ASTRUE,

      Commissioner of Social Security,

      Defendant.

      This matter is before the Court on cross-motions for summary judgment [Docket Nos. 10 and 13]. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and Local Rule 72.1(c).

## I.      PROCEDURAL BACKGROUND

      Plaintiff George Jacobson applied for disability benefits on October 2, 2007, alleging an onset of disability beginning December 14, 2006. (Tr. 141-143). Jacobson alleged that he was disabled as a result of a heart condition, depression, anxiety and arthritis. (Tr. 176). Jacobson was last insured for disability benefits on December 31, 2012. (Tr. 149). Jacobson's claims were initially denied on December 13, 2007, (Tr. 78-80), and on reconsideration on August 5, 2008 (Tr. 95-96). Jacobson timely requested a hearing on September 22, 2008. (Tr. 13, 98). A hearing was held before Administrative Law Judge ("ALJ") Mary Kunz on May 11, 2010. (Tr. 13, 37-77). Jacobson was represented by counsel at the hearing. (Tr. 37). Jacobson testified at

the hearing, as did non-examining medical expert ("ME"), Dr. Andrew Steiner, and Dr. Bill Rutenbeck, a vocational expert ("VE"). (Tr. 10-75).

On September 22, 2010, the ALJ issued her decision denying benefits. (Tr. 10-34). Jacobson sought further review of the ALJ's decision by the Appeals Council. (Tr. 8). The Appeals Council denied Jacobson's request for review, making the ALJ's decision final. (Tr. 1-3).

Jacobson sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. §405. [Docket No. 1]. The parties then filed cross-motions for summary judgment. [Docket Nos. 10 and 13].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

## B.    Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.** **Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also

Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant

has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   JACOBSON'S RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY

### A.   Medical Evidence Bearing on Physical Impairments

In November 2006, Jacobson was referred by Nathan Budde, a cardiology physician's assistant, for an exercise test to address Jacobson's chest pain. (Tr. 314-15). On this test, Jacobson achieved 65% of the age-predicted maximum heart rate, 13.4 METS. (Tr. 314). On April 9, 2007 Jacobson was seen by cardiovascular specialist, Dr. Michael Thurmes, after experiencing significant angina. (Tr. 290). Jacobson told Dr. Thurmes that he was quite limited by chest pain, which most frequently occurred when he was at rest and not engaging in activity. (Tr. 290). At that time, Jacobson was smoking a pack of cigarettes a day. (Tr. 291). Jacobson underwent a coronary angiogram (Tr. 299-300) and was diagnosed with severe two-vessel coronary artery disease. (Tr. 277-310). Jacobson underwent coronary bypass surgery in April, 2007. (Tr. 277-310). At a follow-up appointment after the surgery, a nurse practitioner noted Jacobson had been doing cardiac rehabilitation, but had not been attending all of his sessions. (Tr. 324).

On June 22, 2007, Dr. Thurmes saw Jacobson and noted that Jacobson presented with very obvious depression. (Tr. 328). Jacobson told Dr. Thurmes that his wife had asked him to leave the house and he thought about killing himself, but that he

"was not prone to doing that now." (Tr. 328). Jacobson reported having continuing chest pain, which he thought was being brought on by stress. (Tr. 325). Dr. Thurmes was so concerned about Jacobson's depression that he arranged to have him seen by a psychologist the next available work day. (Tr. 331). Jacobson saw Dr. Lawrence Richmond on June 25, 2007, for his depression and reported that he was drinking several days per week, usually drinking to get drunk. (Tr. 345). Dr. Richmond diagnosed depression and tobacco use disorder and prescribed the antidepressant drug Paxil, which Jacobson had tolerated well in the past. (Tr. 346).

In September 2007, Jacobson attempted to commit suicide by overdosing on benzodiazepines. (Tr. 401-403). Jacobson was admitted and treated at the Monticello-Big Lake Hospital. (Tr. 401-403). Jacobson reported that he believed alcohol "had a big part" in his suicide attempt and admitted that he had been drinking five to ten beers per day. (Tr. 401, 406).

Dr. Thurmes saw Jacobson again on November 20, 2007, some two months after Jacobson's suicide attempt. (Tr. 509-513). Dr. Thurmes noted that Jacobson seemed much brighter and more cheerful and that Jacobson reported that his depression was a little better. (Tr. 509). Jacobson was having more chest pain and Dr. Thurmes recommended another stress test. (Tr. 512). This test was conducted on February 7, 2008, (Tr. 516-518), and the cardiologist recommended a coronary angiogram. (Tr. 517). The angiogram was performed but failed to disclose anything of note, and the cardiologist commented that Jacobson's ongoing chest pain was of unclear origin. (Tr. 520). Jacobson later reported to Dr. Thurmes that activities such as deer hunting and walking did not bring on the chest pain, however it would come on

when he was anxious.  (Tr. 522).  Dr. Thurmes did not believe that Jacobson's chest pain was coronary ischemia.  (Tr. 524),

Jacobson was regularly seen by Budde, the physician's assistant.  Budde conducted Jacobson's pre-bypass surgery exam and (Tr. 356-360) and attempted to assist Jacobson with smoking cessation.  (Tr. 368, 377).  Jacobson saw Budde on January 10, 2008 for back pain and symptoms related to his heart condition.  (Tr. 476).  Jacobson told Budde that he was able to walk more aggressively and without feeling chest pain.  (Tr. 476).  Budde noted that Jacobson had an MRI that show a shallow right-sided L4-5 disc protrusion abutting but not impinging on the L5 nerve root.  (Tr. 476; 500).

On January 28, 2008, Jacobson saw Budde following an increase in his chest pain.  (Tr. 469-472).  Budde changed some of Jacobson's prescriptions and emphasized that Jacobson needed to stop smoking.  (Tr. 472).  Additionally, Budde recommended lifting restrictions for four weeks to a maximum of ten pounds due to Jacobson's low back pain.  (Tr. 496).

On March 3, 2008, Budde filled out a form for the Minnesota Department of Human Services on which he indicated that Jacobson was able to work eight hours a day, 40 hours a week, with a lifting restriction of ten pounds.  (Tr. 700).

Dr. Charles Watts, a neurosurgeon, saw Jacobson in March 2008, for an evaluation and MRI of his cervical spine.  (Tr. 707).  Dr. Watts concluded that Jacobson had significant chronic mechanical neck and back pain that would best be treated through a pain management program.  (Tr. 707).  At the office visit with Dr. Watts, Jacobson reported having right hand numbness and neck pain.  (Tr. 709).   In April,

2008, Dr. Watts referred Jacobson to the MAPS pain clinic for evaluation of his lower back and right arm and hand pain. (Tr. 561-567). At the MAPS clinic, Jacobson was diagnosed with lumbar degenerative disc disease and the MAPS clinician recommended a steroid injection, which Jacobson had that day. (Tr. 567). Jacobson returned to the MAPS clinic on May 14, 2008, for an evaluation and reported that the steroid injection had helped manage his pain and the physical therapy he had been receiving had been helpful. (Tr. 568; 619-627). The MAPS clinician recommended a repeat injection and advised Jacobson to continue with physical therapy and a home exercise program. (Tr. 570). At a June 2008, follow-up, Jacobson reported that he was not doing his home exercises but felt that physical therapy had been helpful. Later that month, Jacobson reported that his pain was a one out of ten. (Tr. 587). The MAPS clinician recommended another steroid injection, which Jacobson had on June 25, 2008. (Tr. 590).

Jacobson returned for a follow-up at the MAPS clinic on July 24, 2008. (Tr. 592-595). Jacobson reported that his symptoms were 50% to 75% improved and that his pain was a one out of ten and under good control. (Tr. 592). In September 2008, Jacobson underwent a nerve conduction study at the MAPS clinic regarding his right hand. (Tr. 613-615). The study showed a moderately severe right ulnar neuropathy at the elbow with evidence of chronic axonal[1] degeneration. Also in September 2008, Jacobson was discharged from physical therapy at the MAPS clinic. (Tr. 628-629). The

---

[1]     Axonal refers to "the single process of a nerve cell that under normal conditions conducts nervous impulses away from the cell body and its remaining processes (dentrites). Stedman's Medical Dictionary, 117 (27th ed. 2000).

physical therapist noted that Jacobson met all of his physical therapy goals and that Jacobson demonstrated improved spine stabilization ability. (Tr. 629).

At an office visit with Budde on November 16, 2009,[2] Budde noted that Jacobson wanted him to fill out a disability form. (Tr. 847). Budde wrote the following in his chart notes:

> I started to fill this out in regards to his ischemic heart disease and hypertension. He later stated that it was more for his depression and back pain. Discussed that I do not determine long term disability status for back pain and that his psychiatrist would have to determine his disability for his depression. Certainly he does have a degree of disability from his heart disease, but mainly due to not having it treated appropriately as he is not taking his medications and continues to smoke.

(Tr. 847).

On December 30, 2009, Jacobson saw Dr. Eric Ernst at the Minnesota Heart Clinic, where he had been treated for his coronary issues. (Tr. 646-647). Dr. Ernst noted that Jacobson was having chest pain again and that "unfortunately he continues to smoke and was noncompliant with his medications over much of the last six months."[3] (Tr. 646). Dr. Ernst recommended another stress test. (Tr. 646). The stress test was conducted on January 7, 2010, and was "essentially normal." (Tr. 652). Jacobson achieved a METS of 10.7.[4] (Tr. 655, 660).

---

[2] There are no records of any visits with Budde between January 28, 2008 and November 16, 2009.

[3] A progress note by Budde dated November 16, 2009, indicated that Jacobson did not have the money to pay for all of his medications. (Tr. 846).

[4] "MET" means "metabolic equivalents." A "MET" is defined as the resting metabolic rate, or the amount of oxygen consumed at rest. M. Jette, K. Kidney, G. Blumchen "Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription,

### B. Medical Evidence Bearing on Mental Impairments

#### 1. Mark Ziebarth

Jacobson saw clinical nurse Mark Ziebarth, APRN, CNS,[5] at the Central Minnesota Mental Health Center between September 18, 2007 and June 18, 2008.[6] (Tr. 535-542; 549-550). On September 18, 2007 Ziebarth stated that Jacobson was suffering from recent severe depression and would not be able to perform any employment in the foreseeable future. (Tr. 201).

On October 1, 2007, Ziebarth noted that Jacobson had overdosed, but that had not been a problem.[7] (Tr. 542). Jacobson reported that he was not working and did not think that he could work due to his cardiac status and depression status. (Tr. 542). On October 30, 2007, Ziebarth noted that Jacobson was going to take his sons deer hunting and that he probably would not hunt, but would take them. (Tr. 540). On December 17, 2007, Jacobson reported that he was feeling more depressed, that he had been turned down for disability benefits and was "looking into some work or appealing his disability, depending on what's going on." (Tr. 538). On January 28, 2008, Ziebarth observed that Jacobson had multiple issues including health, family,

---

and Evaluation of Functional Capacity." 13 Clinical Cardiology, 555-565 (1990) http://onlinelibrary.wiley.com/doi/10.1002/clc.4960130809/pdf.

[5] "APRN, CNS" stands for advanced practice registered nurse, clinical nurse specialist. See *Advanced Practice Nursing: A New Age in Healthcare*, American Nurses Association Backgrounder, available at http://www.nursingworld.org/FunctionalMenuCategories/MediaResources/MediaBackgrounders/APRN-A-New-Age-in-Health-Care.pdf

[6] From his notes, it is not clear if Ziebarth was providing counseling to Jacobson; rather it appeared he was managing Jacobson's medications.

[7] The Court assumes that Ziebarth meant that Jacobson's drug overdose did not present any on-going issues for him.

medical, back and cardiac as well as depression. (Tr. 536). Ziebarth wrote "[a]t this point he is not employable in my opinion due to his depression, anxiety, cardiac disease, back pain, neuropathy, tingling, positive MRI history and getting physical therapy. . . ." (Tr. 536). On March 24, 2008, Ziebarth noted that Jacobson had taken a welding test, but could not handle the rigors of the test and the work. (Tr. 535). Ziebarth saw Jacobson in May and June 2008, and Ziebarth noted the continued presence of chronic pain and Jacobson's alleged inability to work. (Tr. 549-550).

### 2. Dr. Jamie Kutz

Ziebarth referred Jacobson to Jamie Kutz, Psy.D., for psychological counseling. Dr. Kutz saw Jacobson on November 19 and 27, 2007, and January 9 and 22, 2008. (Tr. 531-534). Dr. Kutz assessed Jacobson with major depression, anxiety disorder and noted a history of attention deficit disorder. (Tr. 533). On January 9, 2008, Dr. Kutz noted that Jacobson reported a "moderate" amount of depression. (Tr. 532). On January 22, 2008, Dr. Kutz noted that Jacobson reported feeling "very depressed" but that he had ups and down and felt "ok" some days. (Tr. 531). Dr. Kutz reported that Jacobson's depression was significantly related to his family situation. (Tr. 531).

### 3. Psychologist Berk

MAPS psychologist Ronald Berk, M.Eq., L.P., had individual therapy sessions with Jacobson on June 2, 2008 and March 6, April 6, June 9 and December 14, 2009. (Tr. 667-678). The June 2, 2008 session appears to have been the first time Berk saw Jacobson. (Tr. 667-670). At that time, Jacobson was living with his wife and children. (Tr. 667). Berk noted that Jacobson's current sources of stress were chronic pain, economic issues and lack of a primary support group. (Tr. 667). Berk found Jacobson

awake, alert and fully oriented to person, time and place. (Tr. 669). Jacobson's thought processes were logical and linear without evidence of a thought disorder. (Tr. 669). Berk noted that Jacobson was clearly depressed and diagnosed Pain Disorder with Both Psychological Factors and a General Medical Condition; Major Depressive Disorder, Single Episode, Severe; Generalized Anxiety Disorder with Panic Attacks; and Chronic Pain. Berk assigned a GAF of 48.[8] (Tr. 670),

At the appointment on March 6, 2009, Berk diagnosed Major Depressive Disorder with Associated Psychological Factors and a General Medical Condition; Major Depressive Disorder, Single Episode, Severe; Generalized Anxiety Disorder with Panic Attacks, Attention Deficit by History; and Cognitive Disorder, Not Otherwise Specified. (Tr. 671). Jacobson completed the Beck Depression Inventory[9] at that session and his score was 42, indicating severe depression. (Tr. 671). His "PHQ-9"[10] score was 21, which Berk interpreted as making Jacobson's activities of daily living extremely difficult. (Tr. 671). Berk observed that Jacobson's last suicidal thinking was in December, 2008

---

[8]     GAF or "Global Assessment of Functioning" is a rating of overall psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision 2000) ("DSM-IV") at 34. According to DSM–IV, GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." The DSM-V was issued on May 18, 2013 and has dropped the Axis V, the GAF.

[9]     The Beck Depression Inventory is a twenty-one item self-report rating inventory that measures characteristic attitudes and symptoms of depression. http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx.

[10]     The Patient Health Questionnaire "is a . . .diagnostic instrument for common mental disorders. The PHQ-9 is the depression module, which scores each of the 9 DSM-IV criteria as "0" (not at all) to "3" (nearly every day). http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/

and he reported that his depression was neither better nor worse. (Tr. 671). Berk noted that Jacobson's speech was slow and hesitant and his cognitive processing was slow. (Tr. 672). Jacobson stated that his wife had asked him to leave the house and he was staying with friends in Rosemount and St. Francis. (Tr. 672). Berk assigned a GAF of 45. (Tr. 671).

At the therapy session on April 6, 2009, Jacobson's PHQ-9 score was 23, indicating severe depression. (Tr. 677). Jacobson told Berk that his depression made activities of daily living extremely difficult and that he was having suicidal thoughts once or twice a week and thought that he would be better off dead, though he had no plan to kill himself. (Tr. 677). Berk commented that Jacobson seemed vegetatively depressed and anxious. (Tr. 678). Jacobson was homeless and moving among friends and family for a place to sleep. (Tr. 677). Berk noted that Jacobson's affect was profoundly depressed and that he was anxious. (Tr. 678). Berk assigned a GAF of 45. (Tr. 677).

At the session on June 9, 2009, Jacobson scored a 45 on the Beck Depression Inventory, indicating severe and worsening depression. (Tr. 673). Jacobson's PHQ-9 score was 25, also indicating severe depression. (Tr. 673). Berk opined that these scores showed an "unrelenting profound depression." (Tr. 674). Jacobson reported having difficulty with activities of daily living and suicidal ideation a few times a week. (Tr. 673). Jacobson remained homeless and transportation to his appointments was a problem because of his lack of income. (Tr. 673). Jacobson told Berk that he had applied for a few jobs, but either could not pass the physical exams or the jobs required computer literacy. (Tr. 674). Berk found Jacobson socially withdrawn and noted that he

lost track of the conversation and processed things slowly.  (Tr. 674).  Berk assigned a GAF of 45.  (Tr. 673).

On September 18, 2009, Berk completed a Mental Impairment Questionnaire in connection with Jacobson's application for disability benefits.  (Tr. 637-640).  Berk noted that Jacobson's cognitive processing was slow and he was slow to respond to questions.  (Tr. 637).  In describing Jacobson's mental abilities and ability to do unskilled work, Berk stated that Jacobson had "poor or no" ability to maintain attention in two hour segments, maintain regular attendance and be punctual within customary, unusually strict tolerances, make simple work-related decisions, complete a normal work day and work week without interruption from psychologically based symptoms, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions.  (Tr. 638).  As to Jacobson's mental abilities, Berk noted that he had "poor or no" ability to understand and remember detailed instructions, carry out detailed instructions, or set realistic goals or make plans independently of others or to work appropriately with the general public.  (Tr. 639).  Berk found Jacobson moderately limited in his activities of daily living, markedly limited in maintaining social functioning, extremely limited in maintaining concentration, persistence or pace, and found that Jacobson had three episodes of decompensation, each of extended duration.  (Tr. 639).  Berk concluded that Jacobson had a medically-documented history of mental disorder of at least two years duration that had caused more than a minimal limitation of his ability to do basic work activities and he had a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands would cause him to decompensate.  (Tr. 640).  In

summary, Berk noted that organic brain damage left Jacobson depressed and unable to make decisions, anxious and confused. (Tr. 640).

At the session on December 14, 2009, Berk diagnosed Jacobson with Major Depressive Order, Single Episode, Severe; Generalized Anxiety Disorder; Panic Disorder with Agoraphobia; Attention Deficit by History; Cognitive Disorder, Not Otherwise Specified and Chronic Pain. Berk noted that Jacobson's PHQ-9 score was 21, indicating severe depression. (Tr. 675). Jacobson was having suicidal ideation a couple of times a week and remained homeless—sleeping at his son's apartment sometimes and at a friend's house sometimes. (Tr. 675). Jacobson had just quit his part-time janitorial job, telling Berk "it got to be too much" for him—his back pain had increased and his chest pain was scaring him. (Tr. 676). Jacobson also admitted that his performance was a problem—he would forget what he was doing, turn to another task, and leave the first task undone. (Tr. 676). Sometimes he would forget what he was told to do. (Tr. 676). According to Berk, "[t]he cognitive dysfunction created problems for him and irritated his supervisor even in this simple janitorial job." (Tr. 676). Berk noted Jacobson's demeanor as borderline tearful, dejected and hopeless and his affect was profoundly depressed and anxious. (Tr. 676). Berk assigned a GAF of 45. (Tr. 675).

On July 27, 2010, after the administrative hearing and before the ALJ issued her decision, Jacobson's attorney forwarded a letter to the ALJ she had received from Berk. (Tr. 262-264). Additional medical records had been submitted and received post-hearing, raising the possibility that Jacobson would have to appear for a rehearing. (Tr. 260). In his letter to Jacobson's counsel, Berk stated that Jacobson called him

distraught that another hearing might be scheduled. (Tr. 263). Berk indicated that Jacobson's ability to cope with activities of daily living had collapsed since his attempted suicide in 2007 and that Jacobson was essentially homeless, moving from one relative's house to another. (Tr. 263). As a result, he lost his medical insurance and he was incapable of doing simple paperwork to re-establish coverage. (Tr. 263). According to Berk, "he has been and remains a vulnerable adult." (Tr. 263). Berk suggested that if benefits were awarded, a non-relative representative payee should be appointed. (Tr. 263). In conclusion, Berk stated that "[Jacobson's] loss of executive function,[11] cognitive impairment and inability to make sound judgments along with impulsivity make him a high risk for another suicide." (Tr. 263).

### 4. Dr. Nash

Berk referred Jacobson for intellectual testing by Dr. Nash, who saw Jacobson on August 7 and 12, 2008. Dr. Nash administered the Wechsler Adult Intelligence Scale (WAIS-III), which assesses intellectual capacity in primarily verbal and vials/spatial contexts. (Tr. 680) and the Wechsler Memory Scale III, which is used to assess memory function. (Tr. 680). Dr. Nash observed that Jacobson was very depressed about his job situation and his divorce and had taken an overdose of sleeping pills. (Tr. 681). Jacobson hit his head on the cab of his truck in an accident and Dr. Nash commented that "although not diagnosed, this kind of injury can also result in mild traumatic brain injury by jarring the brain severely." (Tr. 681). Jacobson's

---

[11] "Executive function is a set of mental processes that helps connect past experiences with present action. People use it to perform activities such as planning, organizing, strategizing, paying attention and remembering details, and managing time and space."
http://www.ncld.org/types-learning-disabilities/executive-function-disorders/what-is-executive-function

WAIS-III scores indicated slowed processing times and were consistent with ADHD, depression and possible mild traumatic brain injury. (Tr. 681). Overall, Jacobson showed an average IQ with no significant differences between verbal and non-verbal intelligence. (Tr. 682). Dr. Nash observed that Jacobson scored average to above average in some aspects of the test, giving him an above-average IQ. But on other aspects of the test his scores indicated a borderline IQ. (Tr. 682). Dr. Nash opined that the degree of difference was best explained by traumatic injury.

On the Wechsler Memory Scale III, Jacobson showed significant impairment of auditory but not visual memory. (Tr. 682). Dr. Nash concluded that while Jacobson's general memory was above average, he had specific deficits of auditory and working memory. (Tr. 683). That meant that Jacobson would have trouble with new learning requiring auditory learning and with problem-solving that would require him to retain facts by listening. (Tr. 683). Dr. Nash believed that this supported a conclusion that Jacobson had specific memory deficits caused by mild brain injury or other organic causes, not by his depression. (Tr. 683).

Dr. Nash diagnosed Jacobson with recurrent, severe major depressive order and cognitive disorders. (Tr. 683). Dr. Nash assigned a GAF of 45. (Tr. 684). Dr. Nash concluded that Jacobson was "fully disabled and not able to work for the foreseeable future." Assuming rehabilitation efforts were successful, Dr. Nash believed that Jacobson could sustain part-time work if his auditory memory issues could be addressed. (Tr. 684). Dr. Nash further observed that Jacobson was in need of an effective pain management program to alleviate his pain symptoms. (Tr. 684).

C.     **State Agency Physician's and Psychologist's Opinions**

1.     **Physical RFC**

On December 20, 2007, state agency physician, Dr. Charles Grant. completed a physical RFC assessment based on a review of the records and concluded that Jacobson could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, sit and/or stand with normal breaks for about six hours in an eight hour work day and had unlimited ability to push and/or pull. (Tr. 461). Dr. Grant's assessment noted Jacobson's past history of heavy alcohol use, suicide attempt, arthritis, anxiety, depression, angina and by-pass surgery. (Tr. 462). Dr. Grant assigned Jacobson a "light" RFC. On August 5, 2008, State agency reviewing physician Dr. Aaron Mark affirmed Dr. Grant's assessment. (Tr. 554-556).

2.     **Psychiatric Assessments**

On November 20, 2007, state agency psychologist, Dr. Donald Wiger, examined Jacobson. (Tr. 435-438). Dr. Wiger reviewed Ziebarth's notes, which indicated that Jacobson suffered from major depression, ADHD by history and cardiac surgery with anxiety. (Tr. 436). Ziebarth's notes also indicated the presence of mental illness. (Tr. 436). Jacobson told Dr. Wiger that he watched television and read, was living at his sister's house since he had separated from his wife, and he drove about once a week. (Tr. 436). In addition, Jacobson indicated he could dress himself, bathe and groom himself, he did some light chores, shopping, and could fix himself lunch. (Tr. 436). Jacobson had tried to commit suicide two-and-a-half months before seeing Dr. Wiger because his wife had left him, he had lost a job, and he was not seeing his children. (Tr. 436). Jacobson reported that historically he got along well with people, although he

was not seeing many people at the time, apart from his sister, who he described as his "best friend." (Tr. 436). Dr. Wiger noted that Jacobson seemed tired at the interview and his movements were slow; his affect was blunted, but he was cooperative and answered all of the questions. (Tr. 437). Jacobson reported that his typical mood was "depressed" and that he was depressed all of the time. (Tr. 437). In addition, his anxiety had worsened since having heart surgery. (Tr. 437).

On exam, Dr. Wiger found no evidence of thought disorder and no concerns regarding speech or thought. (Tr. 437). Dr. Wiger found no concerns regarding Jacobson's quality of speech or thought and found Jacobson to be coherent, logical, goal-directed and relevant. (Tr. 437). Dr. Wiger noted no concerns regarding obsessions, compulsions, suicidality, hallucinations, illusions, delusions or ideas of reference. (Tr. 437). Dr. Wiger found Jacobson's concentration to be within normal limits and that he had normal intellectual functioning. (Tr. 437). Dr. Wiger found no evidence of somatoform disorder or personality disorder. (Tr. 437). Dr. Wiger diagnosed major depressive disorder, moderate to severe and generalized anxiety disorder and assigned a GAF of 50. (Tr. 437). Under the medical source statement, Dr. Wiger stated that Jacobson could understand directions, carry out tasks with decreased persistence and pace, respond no more than superficially to other people, and "at this time" could not handle the stressors of a workplace. (Tr. 438).

On December 10, 2007, state agency psychologist, Dr. J. Larsen, completed a mental RFC ("MRFC") on Jacobson (Tr. 440-443) as well as a Psychiatric Review Technique form ("PRTF"). (Tr. 444-457). On the PRTF, Dr. Larsen did not check that Jacobson's impairments met or equaled any Listing; instead he indicated an RFC

Assessment was necessary.[12]   (Tr. 444).   Dr. Larsen opined that Jacobson suffered from major depressive disorder—a affective disorder under Listing 12.04 that did not precisely satisfy the criteria of the Listing.   (Tr. 447).   Further, Dr. Larsen found that Jacobson had generalized anxiety disorder, an impairment that did not precisely satisfy the diagnostic criteria for Listing 12.06—Anxiety-Related Disorders.   (Tr. 449).   As to the functional limitations related to these diagnoses, Dr. Larsen indicated that Jacobson was mildly restricted in his activities of daily living; had mild difficulties in maintaining social functioning; was moderately limited in maintaining concentration, persistence or pace; and had no episodes of decompensation.   (Tr. 454).   On August 5, 2008, Dr. Frederiksen affirmed Dr. Larsen's assessment.   (Tr. 557-559).

In the MRFC assessment, Dr. Larsen found that Jacobson was not limited in his ability to remember very short and simple instructions; and was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentrate for extended periods, complete a normal workday without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and respond to changes in the work setting.   (Tr. 440-441).

Dr. Larsen based his opinions on the following: diagnosis of major depressive disorder and generalized anxiety disorder; a GAF of 50; activities of daily living that indicated Jacobson could perform in a wide variety of tasks (read, household chores,

---

[12]   When a state agency consultant opines that an RFC is necessary, that is equivalent to opining that the claimant did not meet or equal a listed impairment.  See Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010) (the "ALJ's consideration of [the state's medical consultant's] signed RFC assessment satisfied the obligation to receive an expert opinion on equivalence.") (citing Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 978 n. 2 (8th Cir. 2003)).

cook, shop, manage own finances, focus on TV, play games) and which appeared primarily limited by physical issues; an ability to cooperate and tolerate casual interactions necessary to perform tasks; regular drinking which did not significantly interfere with his functioning; long history of work which ended secondary to a buyout. (Tr. 442). Dr. Larsen noted Dr. Wiger's opinion that Jacobson was capable of "srts"[13] in a low stress setting and gave this opinion great weight because it was consistent with the other information in the file.[14] (Tr. 442). Dr. Larsen concluded that Jacobson had the cognitive abilities and concentration needed to complete tasks, make work decisions, remember locations and remember work-like procedures. (Tr. 442). Further, Dr. Larsen opined that Jacobson's impairments might interfere with complex task completion but he could complete simple, repetitive tasks in a low stress environment. (Tr. 442).

## IV.   HEARING TESTIMONY

### A.   Jacobson's Testimony

Jacobson testified at the hearing that he had a GED and worked from 1988 to 1999 as a welder, building cranes—a skill he obtained through vocational training. (Tr. 47). Jacobson worked as an auto worker from 2000 to December 14, 2006, at which time he accepted a buy out from his employer. (Tr. 46). From July 2009 to October 2009, Jacobson worked part-time as a janitor at Canterbury Park, a horseracing track. (Tr. 47). Jacobson testified that he left that position because it "got to be too much"

---

[13]    There is no explanation of this acronym in the document, nor could this Court locate a definition. In light of Dr. Larsen's conclusions and Dr. Wiger's report, this Court believes Dr. Larsen is referencing "simple repetitive tasks."

[14]    The Court could not find any reference by Dr. Wiger to such an opinion.

physically for him, although he also stated that it was the end of the season and that was part of his reason for leaving. (Tr. 48). As to his cardiac bypass surgery, Jacobson testified that he was disabled because he was having chest pain three or four times a week and the chest pains came on both when he was active and at rest. (Tr. 49). Jacobson commented that when the chest pain occurred he would just let it pass and that in the past, he took nitroglycerine and it helped. (Tr. 49). He also stated that he had not taken any nitroglycerine for several months. (Tr. 49).

As to his back pain, Jacobson testified that he could walk for fifteen or twenty minutes before experiencing any trouble breathing and standing was very hard on his back—he could only stand for ten minutes or so before he would "start to feel it." (Tr. 49). Jacobson could only sit for ten minutes before he would need to change position. (Tr. 50). In describing his arm pain, Jacobson stated that he had trouble with his right hand, although he testified that he could hold silverware, feed himself, put a key into a car ignition, hold a can of soda, hold a razor and shave. (Tr. 51-52). Jacobson testified that he had cortisone shots in his neck and lower back but did not describe any limitations arising out of his neck or back pain. (Tr. 52).

Jacobson testified that he had a "big problem" with attention and concentration as a result of his depression—he had difficulty remembering things, such as taking his medication or remembering that he had told someone he would call at a certain time. (Tr. 53, 54). Jacobson testified that he could not concentrate enough to watch a television program. (Tr. 54). Jacobson also testified that he simply "lost interest" in television programs "or a commercial comes on and [he] goes to something else." (Tr. 54). Jacobson told the ALJ that being with a large number of people made him anxious

and that because of his hearing loss, he had trouble distinguishing between voices.  (Tr. 55).  He did, however, have friends he saw once a month or so.  (Tr. 55).  Apart from these issues, Jacobson could think of no other problems that kept him from working.  (Tr. 55).  Jacobson reported that at the time of the hearing he was taking medications for high blood pressure, depression, cholesterol, anxiety and he was on an inhaler.  (Tr. 56-57).

Jacobson was living with his sister and reported that he tried to help her by picking up the house, vacuuming, doing laundry, and preparing his own meals.  (Tr. 58).  Jacobson stated that he saw his three sons once a month.  Jacobson reported that he drank about a six-pack a week.  (Tr. 59).  Under questioning from his attorney, Jacobson testified that he had no hobbies and that he was typically depressed in the mornings, but that afternoons were better and if he could, he would go outside.  (Tr. 60).  Jacobson indicated that he had difficulty with his job at Canterbury Park with bending over to wash tables and that his memory made it difficult for him to complete tasks.  (Tr. 61).

### B.    The ME's Testimony

The ME limited his testimony to Jacobson's physical impairments and did not opine regarding his mental impairments.  (Tr. 62).  Under questioning from the ALJ, the ME testified that the medical records indicated that Jacobson suffered from hearing loss, obesity, coronary artery disease with a history of myocardial infarction, two vessel cardiac bypass surgery, which was successful.  (Tr. 63).  An abnormal stress test led to follow-up, which showed that he had good exercise capacity.  (Tr. 63).  The ME also noted that Jacobson had low back pain and some degenerative disc disease, but

without neural impingement. (Tr. 63). Jacobson was treated for this condition with steroid injections. (Tr. 63). Despite carpal tunnel syndrome, the ME testified that Jacobson had good grip. (Tr. 63). The ME noted a diagnosis of osteoarthritis at the base of Jacobson's right thumb, right ulnar neuropathy at the elbow, neck pain and a diagnosis of emphysema that was not supported by any pulmonary studies. (Tr. 64). The ME also indicated that Jacobson had been diagnosed with anxiety, depression, tobaccoism and chronic pain syndrome. (Tr. 64). Based on his review of the records, the ME testified that he would recommend limiting Jacobson to light work, with additional restrictions on bilateral power gripping, limitation of overhead work and bending to occasional, and precluding working around unprotected heights or hazardous machinery due to Jacobson's hearing loss. (Tr. 65).

In response to questioning from Jacobson's attorney, the ME testified that he had considered Jacobson's cardiac functioning when rendering his opinion, and that while at one time his cardiac functioning may have limited Jacobson to sedentary work, he had shown improvement and could now work at the light exertional level. (Tr. 66). The ME stated that the tests used to measure Jacobson's cardiac functioning would "probably not" predict the effect of work pressure and work-related stress on Jacobson's heart rate or blood pressure. (Tr. 68).

### C. The VE's Testimony

The ALJ asked the VE to assume a fifty-year-old individual with the equivalent of a high school education and Jacobson's prior work history, who was impaired by high frequency hearing loss, obesity; a history of coronary artery disease with past myocardial infarction and bypass surgery; an episode of atrial fibrillation; degenerative

disk disease of the lumbar spine; history of carpal tunnel syndrome, osteoarthritis in the right thumb, right ulnar neuropathy, degenerative changes in the cervical spine, a reference to emphysema and mental impairments variously diagnosed as anxiety, depression, chronic pain syndrome and some concern for alcohol abuse and a reference to attention deficit disorder. (Tr. 70-71). This hypothetical individual would be able to do light work, lift up to twenty pounds occasionally, ten pounds frequently, walk or stand for six hours and sit for two hours in an eight hour work day. (Tr. 71). There would be further restrictions as follows: no power gripping of tools; no power pinching of the right dominant hand; only occasional bending or overhead work; and no working at unprotected heights or near hazards or where good hearing was necessary for safety. (Tr. 71). Because of the allegations of pain and mental impairments, the ALJ asked the VE to assume that the individual should be restricted to routine, repetitive, unskilled work, the work should not involve more than brief and superficial contacts with others, should not involve more than routine changes in the work process or setting, and should involve visual rather than written instruction. (Tr. 71-72). Given all of these limitations, the VE testified that the individual could not perform his past work, but could perform production jobs such as light assembly or packaging—two positions consistent with the DOT. (Tr. 72).

The ALJ then changed the hypothetical and asked the VE to assume that the individual would need to be reinstructed on job duties every day and after every break during the day. (Tr. 73). The VE testified that limitation would not be consistent with competitive work. (Tr. 73). Further, if the hypothetical individual could not tolerate the

stress of a workplace and would decompensate when feeling stressed, those limitations would be inconsistent with competitive work.  (Tr. 73).

Jacobson's attorney posed the following hypothetical to the VE: assuming an individual with the same age, education and work history as Jacobson, but with limitations reflected on the Mental Impairment Questionnaire form completed by Jacboson's treating psychologist, Berk,[15] on September 18, 2009.  Berk rated Jacobson "poor to no ability" in several categories, including paying attention for more than two hour segments; maintaining attendance; being punctual; working in coordination and in proximity to others without undue distraction; making simple work decisions; completing a normal work day without interruption from psychological based symptoms; performing at a consistent pace without an unreasonable number of rest periods; responding appropriately to changes in a work routine; being aware of normal hazards; and taking appropriate precautions in the work environment.  (Tr. 74).  Under those circumstances, the VE testified that the individual could not perform at the level he had previously identified in response to the ALJ's hypothetical.  (Tr. 74).

## V.   ADULT FUNCTION REPORT AND THIRD PARTY FUNCTION REPORTS

### A.    Jacobson's Adult Function Report

On April 24, 2008, Jacobson completed an Adult Function Report.  (Tr. 220-227).  Jacobson reported that he would take his wife to work, pick his wife up from work, go to doctor's appointments and physical therapy appointments.  (Tr. 220).  Before his disability, he was able to work, hunt and fish, but could no longer do so.  (Tr. 221).  Jacobson prepared his own meals, daily—a task that took about an hour.  (Tr. 222).

---

[15]    Jacobson's attorney referred to this questionnaire as Exhibit 30F.  The form is found at Exhibit 28F, Tr. 636-640.

Jacobson reported that he could do cleaning and household repairs, but needed to lie down (although he did not state how frequently) to relieve his back pain. (Tr. 222). Jacobson reported going out daily; driving; walking (but very little); shopping three times a month; and could use a checkbook. (Tr. 223). As hobbies, Jacobson stated that he watched television, but had trouble concentrating on one show. (Tr. 224). Jacobson spent time with others, going to movies or talking on the phone, and would regularly go to doctor's appointments, although he needed to be reminded to do so and sometimes needed someone to go with him. (Tr. 224). In all, Jacobson stated that he had no desire to go out and felt anxiety. (Tr. 225).

Jacobson reported that his disabilities affected his capacity to lift, squat, bend, stand, walk, sit, kneel, climb stairs, his memory, ability to compete tasks, concentration, understanding, following instructions and his ability to get along with others. (Tr. 225). He noted that he could not pay attention for long, forgot spoken instructions, and could not remember what he had started. (Tr. 225). He did not believe that he handled stress well. (Tr. 226).

### B.    Lori Morrissette's Third Party Function Report

On October 12, 2007, Jacobson's sister, Lori Morrissette, submitted a Third Party Function Report on Jacobson's behalf. (Tr. 192-199). Morrissette stated that Jacobson was living with her, and that he spent his time helping around the house, making calls and doing paperwork and "trying to get his life together." (Tr. 192). Morrissette indicated that Jacobson's sons visited them on the weekends, and that Jacobson helped with the family dog, but at times Jacobson slept too much, "not wanting to face the day." (Tr. 193). Further, Jacobson needed help remembering to take his

medication. (Tr. 194). As to his activities, Morrissette reported that Jacobson did dishes and laundry, went out two or three times a week for a walk, shopped for groceries once a week (although he was not focused and did not concentrate on what he was shopping for), could pay bills, count change, handle a saving and checking account, and could engage in activities such as playing cribbage with his family two to three times a week. (Tr. 195-196). Morrissette reported that Jacobson had a "major" lack of concentration. (Tr. 196). On weekends when he saw his sons, Jacobson would watch movies and play cards with them, but had no interest in socializing outside of his family. (Tr. 196).

As to Jacobson's physical abilities, Morrissette reported that that Jacobson tired easily since his heart surgery and suffered from severe depression—he could only pay attention for five to ten minutes at a time and handled stress and a change in routine very poorly. (Tr. 197). With her Third Party Function Report, Morrissette sent a copy of Ziebarth's September 18, 2007 opinion.

### C. Sandy Phalen's Third Party Function Report

On April 24, 2008, Sandy Phalen, a friend of Jacobson's, also prepared a Third Party Function Report on his behalf. (Tr. 212-219). Phalen is a licensed social worker and had known Jacobson for thirty-two years. (Tr. 212). Phalen indicated that she was helping Jacobson with his efforts to better himself. (Tr. 212). Phalen reported that Jacobson had a difficult time getting out of bed due to depression and back pain. (Tr. 212). Further, Jacobson was very unmotivated and needed a lot of encouragement to do house work. (Tr. 214). Phalen stated that Jacobson needed assistance with paying bills, could not handle a savings account, and could only manage a checking account

with assistance. (Tr. 215). Phalen indicated that Jacobson seemed confused by money and needed help in that area. (Tr. 215, 216). As to hobbies and interests, Phalen indicated that Jacobson only watched television and did not want to do anything that might increase his pain. (Tr. 216).

As to social activities, Phalen observed that Jacobson's mind was "fragmented" and that he could not grasp the concept of a schedule, requiring help from his sister or wife to accompany him to appointments. (Tr. 216). Phalen noted that, in her experience as a social worker, she did not believe that Jacobson could function physically or mentally and that he had become withdrawn as a result of pain in his back and neck. (Tr. 217). Phalen further noted that Jacobson could only pay attention for one to three minutes at a time and could not often follow written instructions. (Tr. 217). Phalen observed that Jacobson exhibited unusual behavior in his inability to concentrate and process information. (Tr. 218). Under "remarks," Phalen wrote that Jacobson's disc problems would only get worse and that "his mental condition is such that he cannot function properly and his concentration only [ ] anxiety. Because of his disabilities George cannot function and this affects every aspect of his life." (Tr. 219).

## VI.    DECISION UNDER REVIEW

### A.    The ALJ's Findings of Fact

The ALJ made the following determination under the five-step process. At step one, the ALJ found that Jacobson did not engage in substantial gainful activity since the alleged onset of his disability. (Tr. 15).

At step two, the ALJ determined that Jacobson had the following severe impairments: severe bilateral high frequency hearing loss; obesity; coronary artery

disease with history of myocardial infarction and vessel bypass; degenerative disc disease of the lumbar spine; carpal tunnel syndrome; osteoarthritis in the right thumb; right ulnar neuropathy; degenerative changes in the cervical spine; anxiety; depression; chronic pain syndrome; possible traumatic brain injury. (Tr. 15). The ALJ found Jacobson's physical impairments to be severe as they caused more than minimal functional limitations. (Tr. 16).

The ALJ concluded that Jacobson's mental impairments were also severe. (Tr. 16). In support, the ALJ noted that Jacobson was diagnosed with major depressive disorder and anxiety disorder, for which he was treated with psychiatric medications and psychotherapy. (Tr. 16, citing Tr. 531-546). The ALJ further noted that Jacobson had a possible traumatic brain injury from a concussion, (Tr. 16, citing Tr. 680-684), and a chronic pain disorder. (Tr. 16, citing Tr. 636-644).

At step three, the ALJ found that none of Jacobson's physical or mental impairments met or equaled a listed impairment. (Tr. 16). The ALJ relied on the testimony of the ME to conclude that none of Jacobson's physical impairments met or equaled a listed impairment. (Tr. 17). As for Jacobson's mental impairments, the ALJ determined that none of the met or equaled Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders) and 12.07 (Somataform Disorders). (Tr. 17).

To reach a finding that any of these disorders met the Listings at issue and result in a finding of disability, the "paragraph A" criteria (a set of medical findings) and two of the four "paragraph B" criteria (a set of impairment-related functional limitations), must

be met.[16]  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.009(A).  In addition, if the

"paragraph B" criteria are not met, then a determination must be made as to whether

the "paragraph C" criteria are met.[17]  Id. ("We will find that you have a listed impairment

if the diagnostic description in the introductory paragraph and the criteria of both

---

[16]     In order to meet the "paragraph B" criteria for Listings 12.02, 12.04, 12.06 and 12.07, there must be a finding of at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.  See also, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C) ("Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." (citing 20 C.F.R. §§ 404.1520a and 416.920a).

[17]     To satisfy the "C criteria" of Listings 12.02 and 12.04, the claimant must show:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and
>
> 1.     Repeated episodes of decompensation, each of extended duration; or
>
> 2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3.     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).  The C criteria of Listing 12.06 requires evidence that the disorder results in complete inability to function independently outside the area of one's home.  Id. § 12.06(C).  There are no C criteria for Listing 12.07.

paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.").

In making the determination that Jacobson's mental impairments did not meet or medically equal Listings 12.02, 12.04, 12.06, or 12.07, the ALJ made the following determinations:

In the first functional area—activities of daily living—the ALJ found that Jacobson had mild limitations. (Tr. 17). The ALJ based this determination on the fact that in an Adult Function Report Jacobson completed on April 24, 2008, Jacobson stated that he spent the day transporting his wife to and from work, picked up the house, made lunch and dinner and attended his appointments. (Tr. 17, citing Tr. 220-227). Jacobson reported that he had no difficulty taking care of his personal care and hygiene; did not need special reminders to take care of his personal needs or to take his medicine; did housework and household repairs; went outside daily but did not do yard work due to back pain; went shopping three times a month; and could use a checkbook. (Tr. 17). Jacobson's sister reported that in October 2007, Jacobson played cribbage with his family two to three times a week and enjoyed fishing. (Tr. 17, citing Tr. 192-199). At the consultative exam with Dr. Wiger in November 2007, Jacobson reported that he was able to dress, bathe and groom himself, as well as shop, drive, and perform light chores. (Tr. 17). At the hearing, Jacobson testified that he was living at his sister's house, where he helped with laundry, cleaning, vacuuming and cooking. (Tr. 17).

In the area of social functioning, the ALJ found that Jacobson had "moderate" difficulties. (Tr. 17). The ALJ noted Jacobson reported that in April 2008, his anxiety reduced his social activity. (Tr. 17, citing Tr. 220-227). However, Jacobson also spent

time with others, including going to the movies and talking on the phone with family and friends. (Tr. 17, citing Tr. 220-227). Jacobson had no history of being fired or terminated from a job as a result of being unable to get along with others. (Tr. 17). Jacobson's sister reported that on the weekends he spent time with his sons and enjoyed watching movies and playing cards. (Tr. 17-18). In addition, Jacobson reported that he went to a tavern approximately once a month and that historically he got along well with people. (Tr. 18, citing Tr. 435-439). Jacobson also reported having friends from work whom he saw occasionally. (Tr. 18). In March, 2009 Jacobson indicated that he spent time with a couple of friends. (Tr. 18, citing Tr. 672).

The ALJ found that Jacobson had moderate difficulties with concentration, persistence or pace. (Tr. 18). The ALJ noted that Jacobson reported that he had difficulty concentrating on television shows, difficulty remembering things, and that he lost his train of thought. (Tr. 18, citing Tr. 220-227). According to Dr. Wiger's consultative report from November 2007, Jacobson did not show signs of a thought disorder, his speech was coherent, logical and goal directed and relevant. (Tr. 18, citing Tr. 435-439). Jacobson did not show signs of obsession, compulsion, suicidality, hallucinations, or delusions. (Tr. 18). A mental status exam showed Jacobson's concentration to be within normal limits. (Tr. 18). The ALJ considered Dr. Wiger's opinion that Jacobson would be unable to handle the stresses of a workplace. (Tr. 18). However, the ALJ did not find that this reduced capacity continued for twelve months or longer, as Dr. Wiger saw Jacobson in 2007 and by early 2008, Jacobson reported that his depression had improved as discussed by the ALJ in her analysis of Jacobson's Residual Functional Capacity ("RFC"). (Tr. 18). Furthermore, the ALJ did not find that

Dr. Wiger's opinion was supported by the record, which she found indicated that Jacobson's depression had improved by early 2008, again referring to her discussion regarding the RFC. (Tr. 18).

As for the fourth area—decompensation—the ALJ found that there was no indication that Jacobson had experienced any episodes of decompensation for an extended duration. (Tr. 18).

Because Jacobson's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the "Paragraph B" criteria of the Listings were not satisfied. (Tr. 19).

The also ALJ concluded that the record did not show the presence of the "Paragraph C" criteria for the Listings 12.02 and 12.06 and as a result, Jacobson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security regulations. (Tr. 16-17).

Before considering the fourth step of the analysis, the ALJ determined Jacobson's RFC. The ALJ found that Jacobson could perform light work with the following additional restrictions: he could lift up to twenty pounds occasionally and ten pounds frequently; walk or stand for six hours and sit for two hours in an eight hour day; no power gripping of tools; no power pinching with the right hand; no more than occasional bending or overhead work; no work at unprotected heights, near hazards or where good hearing would be essential for safety; routine, repetitive unskilled work, not requiring more than brief and superficial contacts with others; no more than routine changes in the work process or setting; and work should have visual rather than written

instructions. (Tr. 19). In determining this RFC, the ALJ considered the limitations described in her findings under the "Paragraph B" mental function analysis. (Tr. 19). In addition, the ALJ considered Jacobson's subjective reports of his physical impairments, which he contended limited him to doing "very little." (Tr. 20).

In support of the RFC, the ALJ found that the objective medical evidence showed that Jacobson's physical impairments, while severe, were not as limiting as he contended. (Tr. 20). The ALJ relied primarily on the opinion and testimony of the ME, Dr. Steiner, whose opinions the ALJ found to be consistent with the medical evidence as a whole. (Tr. 20). As to Jacobson's heart disease, the ME noted that Jacobson underwent successful coronary bypass surgery in April 2007. Three months after the surgery, Jacobson reported a 70% improvement. (Tr. 21, citing Tr. 339). In February 2008, Jacobson had a negative ECG test and angiography. (Tr. 21, citing Tr. 469-495, 504-530). After the February 2008, exam Jacobson did not return for a check-up for eighteen months until he asked his cardiac physician's assistant, Budde, to complete a disability form. (Tr. 21). Budde noted that Jacobson "certainly does have a degree of disability from his heart disease, but mainly due to not having it treated appropriately as he is not taking his medication and he continues to smoke." (Tr. 21, citing Tr. 846-847). The ALJ stated that Jacobson's unwillingness to follow prescribed medical treatment reduced his credibility regarding the degree of limitation he experienced from his heart disease, and noted specifically that although Jacobson claimed that he could not afford his heart medication, he was smoking and could afford to buy a pack a cigarettes a day. (Tr. 21, citing Tr. 646-647). The ALJ concluded that a light exertional level was

warranted in light of Jacobson's positive response to surgery and evidence of stable cardiac function.  (Tr. 21).

As for Jacobson's low back and degenerative lumbar disease, the ALJ found that the evidence did not support Jacobson's claim that he could only sit and stand for ten minutes and walk for fifteen or twenty minutes.  (Tr. 21).  The ALJ noted that imaging in 2008 showed only a shallow disc protrusion.  (Tr. 21, citing Tr. 500).  In May 2008, Jacobson received a steroid injection, which he said helped with his pain.  (Tr. 21).  By August 2008, Jacobson had completed all of his physical therapy and was noted to have met his physical therapy goals.  (Tr. 22, citing Tr. 628-629).

As to Jacobson's right thumb osteoarthritis, the ALJ found that the medical evidence did not support Jacobson's contention that his right hand was so weak that he could not pick up even lightweight objects with his right hand, such as a bottle of pills.  (Tr. 22).  Jacobson had complained of bilateral carpal tunnel syndrome and osteoarthritis in his right thumb, which were treated with physical therapy.  (Tr. 22, citing 612-615).  The ALJ noted that there was simply no evidence of treatment or evaluation of right thumb osteoarthritis or right ulnar neuropathy after 2008. (Tr. 22).  In light of the medical evidence regarding these conditions, the ALJ considered that her restrictions of no power gripping of tools, no power pinching with the right hand and no more than occasional bending or overhead work were appropriate.  (Tr. 22).

The ALJ noted that Jacobson's treatment providers never opined that he was impaired by his obesity.  Nonetheless, the ALJ factored Jacobson's obesity into her RFC assessment.  (Tr. 22).

The ALJ gave "some" weight to the November 2007 opinions of Dr. Wiger regarding Jacobson's mental health, but found that Dr. Wiger's opinion that Jacobson was unable to handle the stressors of the workplace was not representative of Jacobson's mental health, which the ALJ concluded showed improvement beginning in late 2007. (Tr. 23, citing Tr. 438). The ALJ incorporated into her RFC determination the opinion of Dr. Nash that Jacobson would have difficulty learning new tasks based on auditory instruction, as Jacobson had an impairment in his auditory memory. (Tr. 23, citing Tr. 679-684).

The ALJ gave little weight to Ziebarth's opinion that Jacobson was "not employable" due to depression, anxiety, cardiac disease, back pain, neuropathy, and tingling. (Tr. 23, citing Tr. 536). Ziebarth was not treating Jacobson for his physical ailments, therefore the ALJ concluded that Ziebarth's opinions on those issues should be given little weight. In addition, the ALJ discounted Ziebarth's opinions because his treatment notes did not reflect any mental health signs or symptoms or the results of any mental health status exams Ziebarth conducted. (Tr. 24, citing Tr. 531-545, 549-553).

The ALJ also considered the opinion of treating psychologist Berk, who opined that Jacobson had "marked" limitations in social functioning, provided slow responses to questioning, and had "extreme" limitations in maintaining concentration, persistence or pace. (Tr. 24, citing Tr. 636-640). The ALJ gave no weight to Berk's opinions. (Tr. 25). The ALJ found that Berk's opinion was not supported by the record as a whole, noting that Berk only saw Jacobson five times between June 2008 and April 2010 in total, with large gaps between their therapy sessions. (Tr. 25, citing Tr. 662-678). Further, other

treatment records described Jacobson as active and in no apparent distress. (Tr. 24, citing Tr. 832, 844). For example, following his attempted suicide and hospitalization, Jacobson reported to Dr. Kutz in November 2007, that his depression had improved, and Jacobson's cardiologist, Dr. Thurmes, noted the same in November 2007; in February 2008, Budde stated Jacobson was doing better with depression and looked cheerful; there was no indication Jacobson could not understand and follow directions in June 2008, during hearing testing, or at a treadmill test he took in January 2010; in August 2008, during psychological testing with Dr. Nash, Jacobson had average scores; in November and December 2009, Budde noted that Jacobson was active, healthy appearing and in no apparent distress, could remember and identify his medications, describe his symptoms, indicate his understanding of the issues discussed, and discuss the need for a check-up; on December 30, 2009, Jacobson could describe to his cardiologist, Dr. Ernst, his recent medical history, his medications and his current symptoms. (Tr. 24-25, citing Tr. 533, 509, 711, 632-635, 654, 607-11, 835, 844, 645-650).

The ALJ gave great weight to the opinions of the state agency consulting psychologists who reviewed Jacobson's medical records. (Tr. 25, citing Tr. 440-443 (Mental RFC completed by Dr. Larsen on December 10, 2007; 444-457 (Psychiatric Review Technique completed by Dr. Larsen on December 10, 2007); 557-559 (reviewing consultant Dr. Frederiksen's affirmation of Larsen's assessments on August 5, 2008). Larsen opined that Jacobson had mild limitations in his activities of daily living and maintaining social functioning, and had moderate difficulties in maintaining concentration, persistence and pace. (Tr. 545). The ALJ considered Dr. Larsen's and

Dr. Frederiksen's opinions consistent with the RFC she had determined and with the medical evidence as a whole. (Tr. 25).

The ALJ considered the Third Party Function reports of Lori Morrissette, Jacobson's sister, (Tr. 25, citing Tr. 192-201), and Sandy Phalen, a friend of Jacobson's. (Tr. 25, citing Tr. 212-219). The ALJ found Morrissette's and Phalen's observations that Jacobson had trouble sleeping and concentrating and that he seemed overwhelmed and unmotivated to be essentially consistent with Jacobson's asserted limitations and inconsistent with the overall medical evidence, which indicated that Jacobson could work given certain restrictions. (Tr. 25). As a result, the ALJ did not reduce Jacobson's RFC further based on these Third Party Function reports. (Tr. 25).

The ALJ concluded that Jacobson's activities of daily living supported the RFC (Tr. 25-26), and that Jacobson's work history did not lend particular support to his claims that he was disabled and unable to work since December 14, 2006. (Tr. 26). As to his work history, the ALJ noted that Jacobson's alleged onset date was December 14, 2006, the date he was terminated from Ford Motor Company; in February 2007, Jacobson attended a job fair to look for other kinds of work; and from July through October 2009, Jacobson worked as a housekeeper and left because of physical limitations and because of his alleged physical impairment. (Tr. 26).

At step four of the evaluation process, based on the testimony of the VE, the ALJ found Jacobson lacked the RFC to perform his past work as a welder/fabricator, which is identified in the Dictionary of Occupational Titles ("DOT") as medium skilled work, or in automobile assembly, which is identified in the DOT as medium unskilled work. (Tr. 26).

At the fifth step of the analysis, the ALJ determined that Jacobson was "not disabled" within the meaning of the SSA regulations. (Tr. 27). In reaching this conclusion the ALJ considered Jacobson's age, educational attainment, RFC and the extent to which his limitations eroded his ability to perform light, unskilled work. (Tr. 27). The ALJ relied on the VE's testimony that given all of these factors, Jacobson could work as a production assembler, packager or inspector. (Tr. 27).

## VII.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    <u>Jacobson's Motion for Summary Judgment</u>

Jacobson challenged the ALJ's decision denying him benefits on the following grounds. First, he claimed that the ALJ erred in failing to find that he met or equaled Listings 12.02, 12.04 and 12.06.[18] Plaintiff's Amended Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem."), p. 13 [Docket No. 12]. Key to Jacobson's argument on this issue were the treatment notes by Jacobson's treating psychologist, Berk, in which Berk had diagnosed Jacobson with major depressive disorder, single episode, severe generalized anxiety disorder with panic attacks, and chronic pain. <u>Id.</u>, p. 14. Berk opined that Jacobson had "extreme" limitation in maintaining concentration, persistence, or pace; "marked" limitation in social functioning; and "poor" mental ability to interact appropriately with the general public. <u>Id.</u>, pp. 14-15 (citing Tr. 636-640). Jacobson argued that the ALJ's conclusion that Jacobson's mental impairments were not "marked," was wrong because she erroneously gave great weight to the non-examining physician's reports, failed to give Berk's opinions the proper weight, and failed to call an ME who was qualified to testify

---

[18]    Jacobson made no mention of Listing 12.07; thus the Court presumes he is not challenging the ALJ's determination as to this Listing.

as to Jacobson's mental impairments.  Id., p. 15.  In particular, the ALJ failed to consider or discuss in their entirety the opinions of Berk and Dr. Nash, a neuropsychologist, which Jacobson claimed should have been given controlling weight in light of the fact that their opinions were supported by the opinions of Ziebarth and Dr. Jamie Kutz, the psychiatrist.  Id., p. 16.  Instead, the ALJ substituted her own judgment for the judgment of Jacobson's treating physicians and therefore "played doctor."  Id., p. 15.

Second, Jacobson argued the combination of his physical and mental impairments limited him to less than sedentary functional limitations.  Id., pp. 16-17.  In support, Jacobson contended that it was error to rely on the ME's opinion that Jacobson could perform light work because the ME failed to acknowledge that the treadmill tests, which the ME testified showed Jacobson could work at the light level, were administered in a controlled environment, for a limited amount of time, and did not properly reflect the stresses and conditions of a real work environment.  Id., p. 17-18.  Additionally, the ME failed to fully consider Jacobson's chronic pain condition and, therefore, failed to consider the medical evidence in its entirety.  Id., p. 19.

Third, Jacobson contended that the ALJ should not have given "great" weight to the opinions of the state agency physicians, Dr. Larsen and Dr. Frederiksen, when neither doctor examined him and neither doctor appeared to have reviewed the treating doctors' opinions.  Id., pp. 19-20.  Jacobson argued that Dr. Larsen's opinions were unsubstantiated in that he failed to consider or receive the treatment records by Berk or

Dr. Nash.[19]  Id.  As for Dr. Frederiksen's opinions, Jacobson claimed she just confirmed Dr. Larsen's opinions without reviewing any additional medical evidence.  Id.  As a corollary to this argument, Jacobson argued that the ALJ improperly discounted and gave improper weight to the opinions given and limitations placed on him by his treating mental health providers, Dr. Nash, Berk, Ziebarth, Dr. Jamie Kutz, and the consulting psychologist, Dr. Wiger.  Id., pp. 20-22.  Additionally, the ALJ's failure to mention the GAF scores of 50 or below assigned to Jacobson by his treating psychologists was error.  Id., p. 22.

Finally, at step five, Jacobson asserted that the ALJ erred by presenting the VE with a faulty RFC.  Id., pp. 23-24.  Additionally, the ALJ's initial hypothetical to the VE did not provide a function-by-function assessment of all of Jacobson's mental limitations.  Id., p. 24.  When the ALJ presented her second hypothetical, incorporating the mental limitations described by Dr. Wiger, including the inability to tolerate stress in the workplace, the VE testified that there were no jobs that Jacobson could do.  Id., p. 24.  When Jacobson's counsel asked the VE to incorporate all of the limitations described by Berk, the VE also testified that there would be no jobs Jacobson could perform.  Id.  In short, Jacobson's position was that the ALJ erred by failing to accept the limitations described in Dr. Wiger's and Berk's reports as supported by substantial evidence in the record.

---

[19]    Dr. Larsen completed his Mental RFC assessment and Psychiatric Review Technique on December 10, 2007.  (Tr. 442). The earliest treatment note from Berk is dated June 2, 2008.  (Tr. 667-670).  Dr. Nash's assessment was performed in August, 2008.  (Tr. 680-684).

**B.    The Commissioner's Motion for Summary Judgment**

The Commissioner argued that the ALJ's decision was supported by substantial evidence in the record and should be affirmed.  Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem."), p. 11 [Docket No. 14].  The Commissioner noted that the ALJ properly determined that Jacobson did not meet or equal the paragraph B listings for 12.02, 12.04 and 12.06—relying on Jacobson's own Adult Function Report in which he described his activities of daily living and social functioning.  Id., p. 13.  The ALJ also properly relied on Dr. Wiger's report to conclude that Jacobson had moderate limitations regarding concentration, persistence or pace and that there was no evidence of decompensation of an extended duration.  Id., pp. 13-14.  As a result, the Listings criteria were not met.

As for Jacobson's accusation that the ALJ had improperly discounted the opinions of Dr. Nash and Berk and "played doctor," the Commissioner submitted that the ALJ merely fulfilled her responsibility to resolve conflicts in the record.  Id., p. 14.  At any rate, the ALJ was not obligated to accept Dr. Nash's opinion that Jacobson was disabled, because that issue is reserved for the ALJ.  Id., p. 15 (citing Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010).

The Commissioner asserted that the ALJ properly relied on the opinions of the state agency reviewing physicians, the ME, Budde and other medical evidence in the record, all of which supported the ALJ's RFC assessment and ultimate decision regarding Jacobson's disability.  Id., pp. 15, 17.  Further, contrary to Jacobson's position, the Commissioner indicated that the METS test could properly be used to

show that a claimant is not disabled.  Id., p. 16.  In addition, the ME did not rely solely on the stress tests to support his opinions regarding Jacobson's limitations—his opinions were based on the medical record as a whole.  Id.

The Commissioner rejected the suggestion that the ALJ erred in failing to give proper weight to Jacobson's treating providers' opinions on his physical and mental limitations.[20]  Id., pp. 17-23.  The Commissioner urged that the ALJ properly weighed the treating providers' opinions regarding Jacobson's mental health status.  Id., p. 20. As for Berk's opinion that Jacobson had lost executive function and was cognitively impaired, the Commissioner argued that the record as a whole contradicted this opinion, including reports by Budde, Dr. Thurmes and Dr. Nash, Jacobson's ability to watch TV, and Jacobson's appearance at the hearing, where there was no indication that he had any difficulty responding to the ALJ's questions.  Id., pp. 20-21.

Regarding Dr. Wiger's opinion that Jacobson could not handle the stresses of a work setting, the Commissioner noted that there was ample evidence that Jacobson's depression improved after Dr. Wiger saw him in November 2007, and, in any event, Dr. Wiger's opinion was not consistent with the opinions of the non-examining state agency consultants, Drs. Larsen and Frederiksen.  Id., p. 22.

As for the opinions of Ziebarth, Kutz, and Nash, the Commissioner contended that Dr. Kutz only saw Jacobson four times and never gave an opinion regarding Jacobson's limitations in respect to his mental health; (id., p. 22 (citing Tr. 531-536));

---

[20]    The Commissioner referenced the opinions of non-examining physicians Dr. Grant and Dr. Mark.  Def. Mem., p. 17.  Jacobson never objected to the ALJ's reliance on any opinions by these physicians.  The Court understood that Jacobson was objecting to the ALJ's reliance on the mental health assessments of Dr. Larsen and Dr. Frederiksen over the opinions of Jacobson's mental health providers.

Ziebarth's opinions were unsupported by his treatment notes and there was no indication that Ziebarth had done any assessments or exams of Jacobson (id., p. 22 (citing Tr. 534-545, 549-50)); and Dr. Nash's opinion that Jacobsen was totally disabled was not entitled to special deference, as the issue of disability is reserved for the Commissioner. (Id., p. 22) (citations omitted).

With respect to Jacobson's GAF scores, the Commissioner pointed out that a GAF score of 50 is the least severe score for an individual with serious symptoms and, in any case, Jacobson failed to show how his GAF scores were inconsistent with the ALJ's findings that he suffered from severe mental impairments. In addition, the Commissioner maintained that the GAF score is not necessarily dispositive evidence of a claimant's mental limitations if there is other evidence supported by the record. Id., pp. 23- 24 (citations omitted).

The Commissioner also rejected Jacobson's argument that the ALJ erred by not performing a function-by-function evaluation of his mental limitations, contending that in fact, she did do such an analysis when she made specific findings as to Jacobson's mental limitations. Id., p. 25. Similarly, Jacobson's suggestion that the ALJ failed to consider how the combination of mental and physical impairments affected his RFC, was contrary to the record, where the ALJ specifically referenced the combination of impairments in her Listing analysis and posed a hypothetical to the VE that incorporated Jacobson's mental and physical limitations. Id. Therefore, the ALJ properly incorporated the physical and mental limitations supported by the record into her hypothetical to the VE. Id., pp. 26-27.

## VIII.    DISCUSSION

### A.    Medical Equivalence and Duty to Develop the Record

A person who meets or medically equals an impairment found in the listing of impairments in 20 C.F.R. 404, Subpart P, Appendix 1 is found to be disabled without further analysis.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  The claimant has the burden of proving that his or her impairments meet or equal a listed impairment.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)).  Before an ALJ considers whether a mental impairment meets or equals a listed impairment, there must first be a medically determinable mental impairment garnered from medical evidence from an acceptable medical source.  See Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) ("The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520(a). These are gleaned from a mental status exam or psychiatric history, id., and must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  See id. § 404.1508.") (emphasis added).  A listing is met when an impairment meets all of the listing's specified criteria.  Johnson, 390 F.3d at 1070 (citing Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."))  Similarly, "[t]o establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'"  Carlson v. Astrue, 604 F.3d 589, 594 (8th Cir. 2010) (quoting Sullivan, 493 U.S. at 531) (emphasis in original).

An ALJ must consider every medical opinion in the record, and determine how much weight it deserves.  20 C.F.R. § 404.1527(c).  "Generally, '[a] treating physician's

opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)). "However, [a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Id. (internal quotation marks and citation omitted) (emphasis added). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id.

If the ALJ does not grant controlling weight to the treating physician's opinion, the ALJ must determine how much weight to grant a non-controlling medical opinion. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In deciding how much weight to give to an opinion of a particular source, the ALJ must apply the following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c), see also Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008).

Further, "[t]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted). This is because an administrative hearing is

a non-adversarial proceeding; consequently, the ALJ must develop the record fully and fairly so that "'deserving claimants who apply for benefits receive justice.'" <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir.1994). Moreover, because "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record," the ALJ's duty to develop the record exists even when the claimant is represented by counsel at the administrative hearing. <u>Snead</u>, 360 F.3d at 838**.**

When a plaintiff has alleged that the ALJ failed to properly develop the record, the proper inquiry is whether the record contained sufficient evidence for fair determination. <u>George v. Astrue, 301 Fed. Appx. 581, 582–83 (8th Cir. 2008)</u>.

The duty to fully develop the record is not satisfied by merely having the claimant's medical records reviewed by a medical consultant. There must be adequate relevant medical evidence generated by a medical expert who has <u>actually examined the claimant</u>, and not just the claimant's records. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000). Consequently, if the medical experts who examined the claimant have not provided sufficient information to make a well-informed assessment of the claimant's impairments and RFC, then the ALJ must make suitable arrangements to obtain such information before deciding whether the claimant is disabled. <u>Id</u>.

There are two other situations when an ALJ must consider obtaining an updated medical opinion. <u>Carlson</u>, 604 F.3d at 595 (citing Social Security Ruling ("SSR") 96-6p, 61 Fed.Reg. 34,466, 1996 WL 374180 (July 2, 1996)). The first situation is "[w]hen no additional medical evidence is received, but in the opinion of the administrative law judge . . . the symptoms, signs and laboratory findings reported in the case record

suggest that a judgment of equivalence may be reasonable." Id. The second situation is where "additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Id.

After careful consideration of the record as a whole, the Court finds that the ALJ's determination at step three that Jacobson did not have an impairment or combination of impairments that met or equaled Listings 12.02, 12.04, or 12.06 was not based on medical evidence in the record as a whole, and the ALJ erred by not seeking the opinion of a medical expert on mental impairments to determine whether Jacobson's impairments, singly or in combination, met or equaled the criteria of these Listings.

First, the only medical opinions in the record to support the ALJ's finding that Jacobson's mental impairments did not meet or equal the mental impairment Listings were the PRTF and RFC prepared by Dr. Larsen on December 10, 2007, and affirmed on reconsideration by Dr. Frederiksen on August 5, 2008. However, neither Dr. Larsen nor Dr. Frederiksen ever examined Jacobson. Further, when Dr. Larsen performed his document review and evaluation two-and-half years before the hearing, he did not have access to Dr. Kutz's treatment notes from January 2008;[21] Berk's treatment notes from 2008 and 2009; the Mental Impairment Questionnaire prepared by Berk dated September 18, 2009; Berk's letter submitted to the ALJ following the hearing; the psychological assessment test scores and opinions of Dr. Nash from August 2008; the

---

[21] As there is no list of the documents reviewed by Dr. Larsen, this Court does not know if he had access to and reviewed Dr. Kutz's treatment notes from November 2007.

GAF scores of 45 to 48 and low PHQ-9 and Beck scores assigned repeatedly by Berk; and the GAF score of 50 issued by Dr. Nash. In fact, it appears that the only records that Dr. Larsen could have reviewed for his evaluations were the three treatment notes generated on September 18, and October 1 and 30, 2007 by Nurse Ziebarth, and Dr. Wiger's consultative evaluation performed in November 2007, in which Dr. Wiger stated that Jacobson could carry out tasks with decreased persistence and pace, and he could not handle the stressors of a workplace, opinions which the ALJ rejected. Further, while Dr. Frederiksen affirmed Dr. Larsen's report on August 5, 2008, there is no indication whether her review included the examination of any records generated after the date of Dr. Larsen's assessments But in any event, she too would not have had access any of Berk's treatment notes from 2009, the Mental Impairment Questionnaire prepared by Berk, Berk's letter submitted to the ALJ, or the psychological assessment test scores and opinions of Dr. Nash from August 2008. In sum, neither Dr. Larsen nor Dr. Frederiksen had the benefit of the opinions of Berk, Dr. Nash and Dr. Kutz, along with Ziebarth, all of which supported a diagnosis of severe depression and anxiety and significant impairments, and Berk's opinions that Jacobson met two of the "paragraph B" criteria (marked limitations in social functioning and extreme limitations in maintaining concentration, persistence and pace), that Jacobson had three episodes of decompensation, and that Jacobson met the "Paragraph C" criteria.

Where, as here, the only medical opinions upon which the ALJ relied for her medical equivalency determination were rendered by evaluators who had never met Jacobson, their opinions were issued without access to the bulk of his treatment records, and were contrary to the opinions in these records, the ALJ should have

concluded that Drs. Larsen's and Frederiksen's opinions on medical equivalence to a listed mental impairment (and ultimately their RFC) might change if they had the additional information.[22]  See <u>Cirelli v. Astrue</u>, 751 F.Supp.2d 991, 1004-05 (N.D.Ill. Nov. 18, 2010) (finding it was unreasonable for ALJ to believe new evidence would not change state agency physician's opinion on equivalence and remanding for updated medical opinion).

Second, the ALJ's reliance on the reports of Budde, and Jacobson's cardiologists, Drs. Thurmes and Ernst, as a basis for totally discounting Berk's opinions, cannot be sustained.  Budde's notes indicated that Jacobson's depression was "better" and that Jacobson appeared "cheerful" to him and in no apparent distress.  Budde was a physician's assistant who treated Jacobson in connection with his heart surgery and coronary issues.  There is no evidence in the record that Budde was qualified or capable of rendering an opinion regarding Jacobson's mental health status.  <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202, fn. 2 (9th Cir. 2001) (recognizing that under some circumstances, a treating physician's opinion might be entitled to little weight as when the treating physician offers an opinion on a matter not related to his or her speciality.) The same can be said for the ALJ's reliance on the observations of Jacobson's cardiologist, Dr. Ernst, in December 2009, that Jacobson was able to remember the names of his prescriptions and describe his current symptoms, (Tr. 25, citing Tr. 646-647), or the notation of cardiologist, Dr. Thurmes, in November 2007, that Jacobson's depression seemed better.  (Tr. 24, citing Tr. 509).  Not only are neither cardiologist

_____

[22]    Of course, Dr. Steiner's testimony at the administrative hearing does not change this conclusion because he testified only about Jacobson's physical impairments.

qualified to opine on Jacobson's mental status, but their isolated observations cannot form the basis for completely disregarding the opinions of Berk or Jacobson's other mental health providers who have treated him for two-plus years.

Third, the ALJ's explanation for giving Berk's opinions little weight based on the fact that Berk's contacts were limited to five sessions over a year-and-a half time period, (June 2, 2008 and March 6, April 6, June 9 and December 14, 2009), ignores the record as a whole, the longevity of Jacobson's mental health issues and treatment,[23] and the consistency of the various mental health providers in their diagnosis of Jacobson's condition and assessment of his impairments. Further, the ALJ's rationale for discounting the frequency of Berk's treatment failed to acknowledge that one of the reasons Jacobson could not see Berk more frequently was that transportation to his appointments was a problem because of Jacobson's lack of income. (Tr. 673).

Finally, while GAF scores do not dictate a finding of disability, here, the ALJ did not even attempt to reconcile her determinations that Jacobson had no "marked" limitations with the GAF scores, which time and again ranged between 45 (Tr. 677, 673, 684) and 50 (Tr. 437) and comported with Dr. Wiger's opinions that Jacobson could not handle work place stress, (Tr. 438), and Berk's opinion that Jacobson's level of cognitive functioning not only affected his ability to work, but made him a "vulnerable adult," (Tr. 263, 676). The Eighth Circuit has noted the importance of GAF scores in determining disability, commenting that "[t]he history of GAF scores at 50 or below, taken as a whole, indicate [Claimant] has "[s]erious symptoms. . .or any serious

---

[23] In addition to treating with Berk in 2008 and 2009, Jacobson saw Ziebarth from September 18, 2007 through June 18, 2008; Dr. Kutz on November 19 and 2007, and January 9 and 22, 2008; and was referred to Dr. Nash for testing on intellectual testing on August 7 and 12, 2008.

impairment in social, occupational or school functioning. . . .".  Pates-Fire v. Astrue, 564

F.3d 935, 944 (8th Cir. 2009) (citing DSM-IV at 32); Brueggemann v. Barnhart, 348 F.3d

689, 695 (8th Cir.2003) (a GAF score of 50 reflects a serious limitation on a claimant's

ability to perform basic life tasks; VE testified that an individual with a GAF score of 50

could not work); Cruse v. U.S. Dep't. of Health & Human Serv's., 49 F.3d 614, 618 (10th

Cir.1995) (ALJ's conclusion that claimant was not disabled was not supported by

substantial evidence where ALJ misinterpreted or ignored claimant's psychiatric

assessment ratings indicating claimant had marked mental impairment, which could

substantially impair his ability to work); Golubchick v. Barnhart, Civ. No. CV–03–3362,

2004 WL 1790188, at *7 (E.D.N.Y. Aug. 9, 2004) (emphasizing an ME's testimony that

a GAF score below 50 is generally incompatible with the ability to work); Mook v.

Barnhart, Civ. No. 02–2347, 2004 WL 955327, at *6 (D. Kan. April 26, 2004) (VE's

testimony was that a claimant's GAF score of 50 would eliminate any possible jobs in

the national economy.  Although an ALJ address need not address each and every

piece of evidence presented to her, (see Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir.

2010)), the key consideration is whether "on the aggregate" the ALJ's opinion, despite

failing to specifically address GAF scores, is supported by substantial evidence in the

record.  Mortenson v. Astrue, Civ. No. 10-4976 (JRT/JJG), 2011 WL 7478305 at *11 (D.

Minn. Sept. 3, 2011); Order Adopting Report and Recommendation, 2012 WL 811510

(D. Minn., Mar. 12, 2012).

The ALJ's failure to resolve conflicts in the record regarding Jacobson mental

health status, for which the GAF scores are one indicator, in conjunction with her

misplaced reliance on the state agency reviewing psychologists whose opinions were

not (and could not be) based on the psychological records as a whole, cannot be sustained.

In summary, this Court cannot uphold the ALJ's determination at step three that Jacobson did not have an impairment or combination of impairments that met or equaled Listings 12.02, 12.04 or 12.06 because the determination was based on opinions by non-examining consultants who did not have the benefit of the entire record for their review and opinions; it improperly discounted the opinions of Jacobson's treating mental health providers based on observations from other providers who lacked any expertise in mental health disorders; and it failed to account for all of the evidence in the record from acceptable medical sources. On this basis, this Court concludes that remand is necessary for the ALJ to obtain updated medical expert opinions on whether Jacobson' impairments, singly or in combination, were equivalent to Listings 12.02, 12.04 or 12.06.

Further, as the ALJ relied on the same faulty reasoning to arrive at the RFC, (Tr. 23-25), if the ALJ concludes at step three that Jacobson did not have an impairment or combination of impairments that met or equaled Listings 12.02, 12.04, or 12.06 then the ALJ should obtain an updated Mental RFC assessment (or a current psychological evaluation, or testimony from an ME qualified to evaluate Jacobson's mental impairments) in which the consulting physician had the benefit of a complete record.

**B.** **The ALJ Committed No Error in Connection with her Determination Regarding Jacobson's Physical Disabilities**

Jacobson contended that the ALJ erred by relying on the ME's testimony that Jacobson could perform light work with limitations because the ME relied on Jacobson's METS scores and the METS test is not a reliable predictor of an individual's ability to

perform in a real work environment.  Pl. Mem., pp. 17-18.  The Court rejects this argument.  To begin with, treadmill tests are, by their very nature, not intended to replicate working conditions, which vary wildly from sedentary office work to extremely physical construction work, where employees are exposed to the elements.  Rather, a treadmill test is designed to measure the capacity of the body to use oxygen effectively and is used to diagnose coronary heart disease and the severity of coronary heart disease.[24]  At any rate, Jacobson's treadmill stress test results were among the many pieces of evidence considered by the ME and by the ALJ in determining Jacobson's physical limitations.   For example, after physical therapy and steroid injections in his back at the MAPS clinic, Jacobson reported that his back pain was a "one" out of ten and that his symptoms were under control.  (Tr. 592).  There was no medical evidence that the bulging disc that was diagnosed was impinging on Jacobson's lumbar nerves.  (Tr. 500, 476).   The tests administered by Dr. Watts showed that Jacobson tested negative on the straight leg raise test, he had a normal station and gait, could tandem walk without instability, and could heel and toe walk without weakness.  (Tr. 709).  On January 16, 2008, Jacobson told Budde that he was able to climb stairs and walk more aggressively without chest pain.  (Tr. 476).  In November 2009, Budde noted that while Jacobson had some degree of disability as a result of his heart disease, it was primarily due to Jacobson not taking his medications and continuing to smoke.  (Tr. 847).  A stress test conducted in January 2010, was essentially normal and there was no evidence in the record that Jacobson's coronary by-pass surgery was not successful.  (Tr. 655, 660).

---

[24]    http://www.nhlbi.nih.gov/health/health-topics/topics/stress/

The limitations the ALJ imposed on Jacobson were consistent with the ME's testimony and supported by the medical record as a whole. Furthermore, the ALJ factored into her RFC analysis Jacobson's obesity, even though none of his treatment providers indicated that Jacobson was limited by obesity. (Tr. 25).

Viewing the entire record as a whole, this Court concludes that substantial evidence existed to support the ALJ's determinations regarding the extent and nature of Jacobson's physical impairments. Accordingly, on remand the ALJ need only consider these physical impairments in connection with the development of his RFC, in combination with Jacobson's the revised mental impairments.

## IX.   CONCLUSION

The Court concludes that the ALJ erred in her decision to give great weight to the opinions of the state agency reviewing physicians regarding Jacobson's mental health status when those individuals did not examine Jacobson or have the benefit of a complete record to review. In addition, the ALJ erroneously relied on the notations and opinions of non-mental health providers regarding Jacobson's mental impairments in explaining her decision to discount the opinions of Jacobson's treating mental health providers, and failed to take into account all of the evidence in the record from acceptable medical sources, including Jacobson's GAF scores. As to Jacobson's physical limitations, the Court finds that the ALJ's conclusions were supported by substantial evidence in the record and should not be disturbed.

Consequently, Jacobson's motion for summary judgment should be granted in part and denied in part, and the Commissioner's motion for summary judgment should

be denied.  The ALJ's decision should be vacated and this case remanded for further administrative proceedings.

If this Report and Recommendation is adopted, on remand, the ALJ should be directed to do the following:

First, to properly address step three, the ALJ must obtain medical expert opinions from acceptable medical sources on whether Jacobson's impairments, singly or in combination, meet or are equivalent to Listings 12.02, 12.04 or 12.06.

Second, if the ALJ does not conclude that Jacobson is disabled at step three, then in determining his RFC, the ALJ must obtain an updated Mental RFC assessment, and give full consideration to all of the records and opinions bearing on Jacobson's mental impairments, in conjunction with the extent of the physical impairments already determined by the ALJ.

Third, if the ALJ still concludes, after considering the new, fully-developed, medical record, that Jacobson's treating physicians' opinions on his physical and mental conditions and impairments and Jacobson's subjective complaints should be discounted, the ALJ must explain the basis for his or her determination on those matters in light of the new record.

Finally, if the ALJ reaches and revises the RFC determination, new testimony from a vocational expert must be solicited in order to determine whether, at step five of the evaluation process, there are any jobs that Jacobson could perform in the national economy.

**X.     RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 10] be **GRANTED** in part and **DENIED** in part and this matter remanded for further consideration consistent with this Report;

2.     Defendant's Motion for Summary Judgment [Docket No. 13] be **DENIED.**


Dated: August 6, 2013

*Janie S. Mayeron*
JANIE S. MAYERON
United State Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 20, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.